Good morning. Please be seated. Still morning. We're going to pick up our calendar where we left off. Judge Wesley is joining us, and the first case is Danielle Lenzi v. Systemax, and the U.S. Equal Employment Commission is also arguing. Proceed. Good morning, Your Honors. Perry Friedman for the appellant, Danielle Lenzi, who I will be referring to as Marku since she's now married. I know. She wants to be called Marku? Yes. I'm happy to do that. Go on. So that's what we will do. And I will be addressing the issues of pregnancy discrimination, retaliation under Title VII, and retaliation under the whistleblower statute for the Consumer Product Safety Improvement Act. And the EEOC will be addressing the issue of pay discrimination. Regarding, I'd like to start with the pregnancy discrimination. The first three parts of McDonnell-Douglas were met in this case, and there's no issue about that, that she was a member of a protected class and that she was qualified for her job and that she suffered an adverse employment action. No one ever said anything, actually, today about her being pregnant? Nobody said anything about it, but on the other hand, they were careful not to. She had told her immediate superior on May 31st that she was pregnant. When she was continuing trying to get all of her expenses paid by the company on June 10th, it was at that time that she told Mr. Reinhold that she was pregnant, and it was two days later that he decided to have the internal audit. There was no reason, under these circumstances with the temporal proximity . . . This was the first time they had done such an audit? This was the first time they had done such an . . . Was that on her trip, or was that everything? Everything. They had never done an audit for a domestic employee prior to Ms. Marcoux. Did they do it for any of the other department heads? No. No. There was never any kind of internal audit for any of the other department heads. There was never an internal audit for anybody, at the vice presidential level especially. This was the first time, and I should point out, not only that, but by the time the internal audit started, she had already agreed to pay everything, so . . . She had gone on previous business trips, but she wasn't questioned about when she left or whether she attended every session. Correct. And not only that . . . Did you say that she had agreed to pay everything? Yes. She had agreed to pay everything before the audit. Which was for the day or two that they wanted to judge her personally. Correct. And that was the only issue at the beginning of the audit, was whether or not she had paid everything. And how closely did this follow her telling them that she was pregnant? Three days. Three days? Three days. That long it took. Yeah, that long. In fact, you could even make the period shorter, because at first he had asked for her to give up meetings, and she had done that the next day. So that even cuts it even closer. And for that reason, that's why we think that in this particular type of case, to meet the threshold, there's definite temporal proximity between the time that the pregnancy was learned. This was a 12B6 dismissal, right? No, this was a summary judgment. Summary judgment, right. Yes. But were all the assumptions drawn in favor of Ms. Lenzi, Ms. Marcoux? Ms. Lenzi. Ms. Marcoux. The same person. We don't believe that they were. We don't believe that they were at all. In fact, what the court did was, when it looked at the issue of temporal proximity, it kind of went backwards. It talked about the retaliation that occurred before she told anyone that she was pregnant. She didn't consider at all what happened after Ms. Lenzi made that announcement. And you say the error is because, in essence, the court said she hadn't established a prime fish case. And so it never got to the burden-shifting structure. Right. It never got to the burden-shifting. That was exactly my question. Right. So that's what you're looking for, right? Yes. Yes. It should be remanded for that reason. Now, if I may go on to retaliation. This was another instance where the court did not look at the facts and what would be most favorable to the plaintiff. There was this email where Ms. Marcoux asked that she be paid the same as her peers, did not use—we will see, obviously, in the document, the word male peers was not used, but the court— You mentioned all their names, didn't you? Mentioned all their names. They were all male. They were all on the same committee. They all report to the same person. But in addition, when Ms. Marcoux was deposed, she stated that when I had asked for more pay, I said I wanted to be paid equal to my male peers. This does not appear anywhere in the decision, and the court did not consider it at all. And this was a very important fact. Deposition testimony is to be considered in a summary judgment. That's basic. And it was not considered at all by the court. I see I'm about to run out of time, so if I could just briefly talk about the consumer product safety. Yes. Yes. In that particular case, again, the court did not find that—did not go beyond the prima facie case. As I say in my brief, there isn't much case law regarding the statute, so the Sarbanes-Oxley standard is used. And the standard that's at issue here is whether or not a reasonable—she had a reasonable belief that federal law was being broken. The court said she did not show an objective reasonable belief. We disagree because— Her complaint was that the salary allocations were not— The salary allocations were such— How's that—I don't understand. I mean, how does the federal standard require—I mean, if an employer makes a decision to pay somebody X amount of dollars and she thinks that the market's more than that, I mean, how does that become a violation of the safety standard? Well, it's a violation— Because they're not paying enough? Well, you need competent people. And she could not— Well, I understand that. But her complaint was she didn't think she could hire people at that level. That was her—that was her belief that she couldn't hire people at that level. That wasn't—that didn't prove itself to be the case, or we don't know, do we? Well, she had done the research before— Well, so you're saying that just the simple fact that she thought that the market was much higher price than that makes out the fact that she thinks that there was then a violation of the safety standard? Well, there was—we're talking here about a potential violation. There was no— It's kind of like a second step, isn't it? Well, yes, but— It's completely different than if they were just ignoring a safety standard and not enforcing it, right? Well, it's different than that, but because of the position that she held as the vice president for risk management, it was part of her portfolio. She had dealt with recalls. She had dealt with an exploding battery case. She knew that if she didn't have people and she didn't have competent people, that for that reason— These disputes occur all the time within corporate structures as to what the appropriate salary structure is with regard to hiring. But the difference is, most of the time, the employees aren't retaliated against for that. Okay. Okay. We never once said, I believe we're in violation, or we could be in violation of the CPSC if we don't fill these jobs with competent people. Well— We have to draw that out. She felt that she needed to be subtle. She was not looking to be in court. She was not looking to be here. Had she said, we're violating federal law, she felt for sure under those circumstances there would be retaliation. She wanted to be very careful, and that's the reason why. Fair enough. Thank you. If there are no other questions, thank you very much, Your Honor. We'll hear from the amicus, from the EEOC. Thank you. Thanks. Good morning, Your Honors, and may it please the Court, Barbara Sloan from the EEOC. We're here to talk about the Title VII claim, and we had two points that we really wanted to make. One was that the district court erred in holding that essentially a plaintiff has to show substantially equal work plus intent in order to state— The court seems to have confused some of our other cases in which there were both EPA claims and Title VII claims in which the EPA claim had already been clearly established, and somehow in our language in our earlier decisions has indicated that, well, if you make that out, then obviously you're making out a Title VII claim, to somehow be that the EPA standard is then the Title VII standard, and your concern is that that's not the case, right? Right. Well, of course, it would be enough if you had— Well, it would be if it's conceded that it's an EPA claim, but people can be paid differently based upon—for doing different work, but still be discriminated against based upon sex or some of the other suspect classifications. Exactly, Your Honor. That would be sufficient, but it's not necessary. Plaintiffs should be entitled to use any evidence to show pay discrimination based on sex or any other factor. The district court judge seemed to think that because the claimant wasn't doing exactly the same work as her fellow vice presidents, of course, she wouldn't be because they were all vice presidents with particular areas. If we took that logic, then no female vice president with all male vice presidents would ever be able to establish a discrimination claim based on unequal pay, right? Exactly. That's exactly what seemed to be— Are you familiar with the evidence in this case? You're familiar with the benchmark-based salary evidence? I am, Your Honor. In this case? Mm-hmm. And it appears that Mrs. Marcu was paid below the benchmark and all but one of the other vice presidents were paid above the benchmark. Well, that was one of the points that plaintiff definitely pulled out of the evidence. And that would be certainly something that the court could take into consideration and so could a jury. The important thing about all of these like similarly situated, they're fact questions for a jury and the facts here are kind of like a case that we cited which was the McGinnis case where this court compared the director of human resources to the deputy director of programs and had no trouble finding that those were comparable, that you could compare those two. They were similarly situated. So it's fact intensive. You look at what they're required to do and the background to some extent, but you don't just look at the titles. Right. All of the circumstances. It's that, for example, the court said in McGinnis that the standard was that when you look at the, is the situation sufficiently similar to the plaintiff to support at least a minimal inference that disparate treatment is attributable to discrimination. It's kind of loosey-goosey, depends on the facts, very flexible and it's a de minimis standard as well. So the district court was just wrong and we would ask the court to make that clear. Thank you. We'll hear from Systemax. May it please the court. My name is Mark Manchin. I represent Systemax and the individual defendants. I'd like to start, if I may, by taking issue with something Judge Wesley said. This case is not Gunther. All right. Not what? Not Gunther. It's not the Supreme Court case in Gunther. The Supreme Court in Gunther held a long time ago that there is a difference, that you can make a broader claim under Title VII, however, you have to make that claim. The problem here is that the district court judge seemed to say that they weren't doing the same thing, same jobs. I don't think that's the right standard. Do you? I respectfully . . . it's not the right standard, but that's not what the district judge said. Well, I'll take a look at it. How's that? Okay. What the district judge, in my opinion, said and where the difference comes in is this. In Gunther, the plaintiffs came forward and said, we have other evidence. We would like to broaden this case to show you this. What the judge said was, no. Once I reach a decision that the positions aren't equal, you are done. That's the end of the inquiry. That was wrong, correct? That was wrong. That's acknowledged. I think the Second Circuit has recognized that. Do you know what this judge did, however? No. Let me explain why. I don't believe that that's what this judge did. Okay. Tell me why. You have to look at the evidence that was given to this judge. In this case, Ms. Marcoux put all of her eggs in the basket of, I do the same or my job is as valuable as theirs. It was a straight comparable worth analysis. There was no other analysis. Do you have this baseline data in the record? The benchmark? The benchmark. All right. If I may, just let me finish this point. I will get to the benchmark and why the benchmark doesn't apply. What they did not do was, they made absolutely no other argument to try to broaden it. Everything was one issue and the judge looked at their brief and the brief clearly said that, look, we're not even going to talk about Title VII. In fact, they waived Title VII. We're not going to talk about Title VII because we think we win on the equal work argument. They made no effort whatsoever in this case to argue that there was any other reason. Our court, of course, looking at the record, can decide on any basis that the record supports. That is absolutely right. However, in that case, short of a waiver, which I think frankly exists here, but if it's not considered a waiver, so now for the first time on appeal, somebody looks at the benchmarking and does a back of the envelope, basically, you know, limited analysis and decides, ah, this may support our position. It doesn't. To the court below, we provided an expert witness. That expert witness explained how benchmarking goes. It's not sort of a gross number. The analysis is, where do you appear against the median? And if you look at the record, which talks about the expert, or the expert cites what he looked at, two of the men, there were five people that had benchmarking. Two of the men earned more than the median. Two of the men earned less than the median. And plaintiff was right in the middle of those five people. None of that analysis was done. It's very difficult for people to stand up here when there was expert testimony presented, when there was no discovery done on this below, and to say, well, you know, they could have done this. The answer is very simple. Down below, they thought they had one argument, and that is that she should make the same amount as the comparators. Why isn't this a factual issue that should go to the jury?  There is no . . . They put in the benchmark-based salaries, and they showed that Mrs. Marcoux was dramatically below the benchmark, and the other three vice presidents, except for the general counsel, who had the problems, I understand, were above the benchmark. Why isn't this enough to get to a jury? Baker was also below the benchmark, because it ignores, by the time you get to the summary judgment motion, you should be at a point where you can offer the evidence that you're going to depend on. In this case, there was no evidence. They didn't believe they had it. Yes, you can second-guess. Yes, you can Monday-morning quarterback, but there was no real analysis. There's no real analysis here, all right? The analysis was done in the court below, and what that showed was that Ms. Lenzi was paid fully competitive, as fully competitive is defined in wage analysis. She was fully competitive with other risk managers. Ms. Lenzi never claimed that she wasn't treated equally as to other risk managers, all right? She said only one thing. She is claiming that, because the benchmark-based salary for risk managers is $27,000 more than she was earning. For risk, well- For risk managers. Vice President of risk management. That position, all right, that- Is that not correct? She was 44% of, in other words, if you have 50% as the median, she was earning 44% of that, and total compensation, 46%. The definition of fully competitive is within plus or minus 10. That was in the expert's report. Why isn't this a factual issue for the jury? A fact that she's already- It is because it was never raised below, and because the minimal information they've given you now after the fact, which contradicts the expert testimony, which was never contradicted below, doesn't support that. As far as I- Could you talk about the pregnancy discrimination? Sure. All right, so this is why I believe that the pregnancy discrimination, it is not sufficient, the proximate timing of that. Facts matter, all right? The facts in this case are this. She was told, she has this case, she takes a weekend, she drives for 322 miles in a car. She told them she was pregnant three days before she went on this trip? No, that's not accurate. Here's what happened. She goes on the trip, she goes on the trip, she comes back. They challenge her expense report. And then she said that I wouldn't have wanted to go anyway. They challenge her expense report. And even before, not only are they challenging her expense report, she keeps again pushing and pushing and pushing. I wanted to have meetings. I tried to have meetings. I couldn't have meetings. Finally, he says, look, I understand what you did. You tacked on some time. I do it all the time myself, all right? But I pay for it. I'm asking you to pay for it. And then she agrees to do it. No, she didn't. And I'll explain why. So your opponent made a misrepresentation to us? Misrepresentation is way too strong for that, but let me explain. He was wrong? Because that's- The answer is yes. Yes, he was wrong, all right? Because, if I can just put the timeline out there, and then I'll come back to that question. Okay, so she goes on the trip. She comes back. Her supervisor questions it. She keeps pushing back. Eventually, he says to her, look, there's just so much BS I can take. I didn't want to examine it, all right? I don't want to examine it, but there's just so much BS I can take. She pushes back again. That's the first time she even raises the pregnancy, after he told her, basically, if you push back again, I'm going to be forced to do a full-scale investigation on this. She pushes back again. Even then, he doesn't immediately launch into an investigation. Did he ever do this with any of the other vice presidents? Nobody else was ever warned. Nobody else in this situation was ever warned specifically that if you continue to push, we're going to have to investigate. Did she ever agree to pay for it? The answer is yes and no. When? Not yes and no. Well, I'll tell you why. Let me explain why. Be quiet, please. I'm sorry, I apologize. Did she agree to pay for it, yes or no? She agreed, but she didn't. And the way she didn't- I'm not interested in the rest of what you have to say. I'm not interested in this cute answer. It's not a cute answer. Did she agree to pay for it or not? Your Honor, here was the problem. She said she would pay for it. Please, Your Honor, I understand. I don't, don't. She agreed to pay for it, then she went to her own assistant and said, I'm going to pay for this, but I'm not going to pay. Don't charge me for the taxes. You can answer that, but she did agree to pay for it, then there's a dispute about whether the taxes are owed. The question about whether or not when she agreed to pay for it, all right? It was never, she never flat out said, I'm going to pay for it. She went to her assistant and said, alter the records. When did she tell her supervisor or anyone who she reported to that she was pregnant, what was that date? May 31st. That, yeah, that date was, the dates are correct. It was several days after she was told, if you continue to challenge this, I am going to have to investigate this matter. She didn't tell them before she went on this trip to California? Correct, she did not tell them before she went on. In the course of responding to the questions, she said, I had morning sickness, you know, I'm pregnant. So they knew by then, right? They knew after she was told that if you continue to push this, we're going to investigate. The answer is yes. Have they done an audit of any other expenses of any other vice president? I don't believe they've done a formal audit of expenses. Well, audit, formal or not. They've done audits of employees, both domestic and foreign. They've never done an audit of somebody else on the expenses. And how much was involved altogether? Well, there was a small amount. However, all right, the issue became that when they did the audit, they find, one other factual issue. Let me just quickly do this. After he says to her, there's just so much BS I can take, pay it, she continues to push. He then says to her, all right, look, if you provide me with evidence that you, in fact, had meetings, all right, and they had canceled, and you tried to move, I will pay for this. She sends 13 pages of emails. The emails make clear one thing, that she was lying to him every time she said to him, her him being her supervisor, that she was trying to get meetings. The 13 pages showed that before the day she left, she didn't try to make one meeting, and that there were no meetings that she ever tried to make, which were during that weekend. So now, that's when he orders the audit. It's not just that. He says, all right, send me proof, and what she sends instead is proof that she lied to him. As a result of that, he moves it out to the audit. With regard to the pregnancy discrimination, the timing is the same. You have circumstances before, and that is he already threatened to do that before he ever knew that she was pregnant. And you have circumstances after. The circumstances after were based on the fact that they found other intervening wrongful conduct which destroyed their trust in her. And in conclusion, your time has expired. It has. And in conclusion, I do apologize if I certainly not looking to insult or upset the panel at all, but I do think that facts matter. I do think that if we look at the facts, that we will support the district court's decision below. Thank you. Thank you, counsel. Mr. Freedman, you've retained two minutes for rebuttal. Thank you, Your Honor. Didn't she explain in her response that she tried to make appointments? Is Mr. Mantra correct when he said all she did was prove that she was lying? No, not at all. What she, the email showed that she tried to make meetings. Unfortunately, most people, as she found out, were not flying in early as she assumed that they would. So she wasn't able to make any meetings, but she tried to make meetings, which is all that she said. What I believe is that facts do matter. However, how the facts matter at a summary judgment stage is that the court is supposed to take all facts in how they favor the plaintiff. When Mr. Mantra said, I don't want to do a forensic examination, he also said in that same email, as far as I'm concerned, the matter is closed. Mr. Mantra looks at that as a threat. I don't look at that as a threat, and the court shouldn't look at it as a threat. That was him saying, I'm done. This is what I decided, and that's it. When she came back later and said, I wouldn't have gone unless I felt I needed to because I had morning sickness, he could have said, what's wrong with you? I already told you, I made my decision. Instead, he reopens it. What changed? What fact changed between the first time and the second time? He now knew she was pregnant. And he had at this point, and because there was retaliation that we didn't really discuss the specifics of it. But there was retaliation prior to this. She had been demoted. She was chained to her desk. Even if she wanted a cup of coffee, it was taken off like a vacation day. No one else at her level in the- And no one else at her level was treated like that at all. In fact- You argued equal work for equal pay below. And tell me how this transmogrified into a Title VII pay discrimination case. Well, the court below decided that it was going to discuss the Title VII. The court below looked at the issue of whether or not there was any kind of claim of a hostile work environment. And what we had claimed below was that there were all these instances of sexist remarks and inappropriate behavior. And while none of them related directly to pay, they did show that this was an atmosphere where there was hostility toward women, and women weren't going to be paid as much as men. The issue was is that Ms. Lindsey said she wanted comparable pay. Equal pay was kind of put words into her mouth at the deposition at other times. I mean, there was an equal pay claim, which we are not appealing the equal pay claim. But I believe, and we believe, and the EEOC believes that the court incorrectly married the two. Saying that at all times, since you've made an equal pay claim, that means automatically that you now have on the Title VII, it's under the equal pay purview. Because your opponent says that you married it, that you press an equal pay claim as the indication of discriminatory animus. That's where I take his argument to be. And at special appendix 48, the court takes issue with the clarity of your pleadings. And then presses into the Title VII claim. But I'm having trouble parsing out of it that it's viewed that you actually did that. Because there's an acknowledgment that you had to prove discriminatory animus. Yes. But the court does seem to then seize on Tomka, which is our case, which has that unfortunate quote, a claim of equal pay for equal work under Title VII. And the state statute is generally analyzed under the same standards as an EPA claim. And hindsight's always 20-20 for us. And maybe that was an unfortunate sentence, because I'm not certain that that's. It's true in the context of Tomka, but I don't think it's always true. Well, it's definitely not true in this case. Every vice president, the male vice presidents. Because the district court judge then went on and seemed to think that the comparators had to be, that she had to be able to do the comparator's job for that to be a comparator. Right. I don't think that that's the standard in Title VII. I get that to be the concern of the EEOC. And it's a rightful concern. And under the facts of this case, there was not a single vice president who could do the job of the other vice presidents. This was true for all the males as well. So, which is why you have, the court has to look at the record de novo. And your opponent is pressing in that sense that you never really made that argument. Is that? Well, that argument was not made explicitly below, but the Title VII claim was preserved. There was a Title VII claim. You did try to argue, though, that the vice presidents were equals? I don't, I think that she, at all times, and if you look through the record, the phrase used is not equal, it's comparable. Okay. Comparable is different than equal. That's certainly the case. Thank you. Thank you, your honor. Thank you all. Interesting case for a reserved decision.